J-S44037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMAR PASCHALL | : | |
| | : | |
| Appellant | : | No. 455 MDA 2022 |

Appeal from the Judgment of Sentence Entered January 31, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0000910-2020

BEFORE:  PANELLA, P.J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED: FEBRUARY 22, 2023**

Jamar Paschall (Paschall) appeals *pro se* from the judgment of sentence imposed in the Court of Common Pleas of Berks County (trial court) following his jury conviction for robbery, conspiracy to commit robbery, theft by unlawful taking and simple assault, as well as his bench conviction of person not to possess a firearm.[1]  Paschall claims that trial counsel provided ineffective assistance, and he challenges the weight of the evidence

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3701(a)(1)(ii), (v), 903, 3921(a), 2702(a)(1) and 6105(a)(1). Regarding the firearms conviction, Paschall was prohibited from possessing a firearm because of a 2009 aggravated assault offense.

supporting his conviction and contends the trial court erred in denying his motion filed pursuant to Criminal Rule of Procedure 600.[2]  We affirm.

## I.

This case arises from Paschall's April 15, 2019, armed robbery of Cedrique Miller (Miller) at Miller's residence, located in the City of Reading, Berks County.  Paschall planned the robbery with his cousin, Brittany Paschall (B.P.),[3] who targeted Miller because he was a drug dealer who supplied her with heroin and cocaine, and she knew he had money from selling drugs.  After her arrest, B.P. gave a statement to police detailing her involvement in the incident and Paschall's role as the gunman.  On May 28, 2019, a criminal complaint was filed against Paschall charging him with robbery and related offenses and a warrant was issued for his arrest.

## A.

In September 2021, Paschall filed a motion to dismiss the case pursuant to Rule 600, claiming that the Commonwealth failed to exercise due diligence in bringing him to trial within 365 days of the filing of the complaint.  In response, the Commonwealth averred that on July 26, 2019, Paschall was arrested in Pottstown, Pennsylvania on unrelated felony charges and was

---

[2] **See** Pa.R.Crim.P. 600(A) (stating general rule requiring defendant to be brought to trial within 365 days from filing of criminal complaint).

[3] We have used initials to denote Ms. Paschall's name in order to avoid confusion with Paschall.

incarcerated in the Montgomery County Correctional Facility (MCCF). Pottstown Police notified Reading Police of Paschall's arrest that same day, and a detainer was lodged against him for this case. In November 2019, this case was scheduled for a December preliminary hearing, and a writ was sent to the warden of MCCF for Paschall's transport from that facility for the hearing.

At the October 2021 hearing on the Rule 600 motion, the parties focused on only one continuance—from July 26, 2019 through November 21, 2019—and defense counsel argued that this approximate four-month period from the time of Paschall's arrest and incarceration in Montgomery County until his preliminary hearing was scheduled in this case was not excusable time. While defense counsel acknowledged that this delay "may not be the Commonwealth's fault exactly" he contended, "it is not the defendant's responsibility either." (N.T. Hearing, 10/18/21, at 2-3). The Commonwealth countered that during that time period, Paschall had been arrested on new drug and robbery charges in Montgomery County, and authorities in that county were not willing to transfer him to Berks County for proceedings in this case. The trial court denied the motion on October 19, 2021.

**B.**

At Paschall's jury trial, the Commonwealth presented the testimony of Police Officer Ryan Solecki of the Reading Police Department; Miller, who testified under subpoena and was a reluctant witness for the Commonwealth;

Criminal Investigator/Detective Joseph Snell; and B.P. The defense did not call any witnesses.

Officer Solecki testified that on the night of the incident, he responded to a report of a robbery at Miller's residence. He spoke with Miller, who indicated that he had invited B.P. to his house earlier that night and she brought her friend, a 6-foot, 200-pound dark-skinned male, with her. The man was armed with a gun, demanded money from Miller and took various items from his home. Miller did not recognize the male, but he showed Officer Solecki B.P.'s Facebook profile picture on his cellphone. Because of the nature of the offense, Officer Solecki referred the investigation to the police department's Criminal Investigation Division.

Miller testified that he had been friends with B.P. since 2016, that they used controlled substances together, and that he would occasionally provide her with drugs. (*See* N.T. Trial, 10/20/21, at 12-13). On the night of the incident, B.P. called him asking for cocaine and said that she would pick it up at his house. Miller testified another friend, Brandy Williams,[4] was also at his residence at that time. When B.P. arrived at 9:00 p.m., she told Miller that a friend was in the car and that they wanted heroin instead of cocaine. Miller made a phone call to arrange for heroin, and B.P. asked if her friend could

_____

[4] Ms. Williams also is referred to by the name "Nicky" in the record. (*See* N.T. Trial, at 16, 27).

come inside. Miller, who was high at the time, said that was fine. A few minutes later, Miller heard knocking and commotion at the door. He recounted that, "the next thing I knew, there was a guy coming around the steps" with a gun in his hand "and told me don't move, don't move." (*Id.* at 20-21). The assailant wore a hoody that partially covered his forehead and a skeleton mask covering his mouth up to his eyes, and Miller observed that he had very dark skin by looking at his hands and forehead. Miller ran to the back of his bedroom into a separate room and shut the doors behind him. As the man attempted to push the doors in, Miller offered his wallet with $270.00 cash in it. When Miller opened the door to hand over the wallet, the man "put his hand around my neck and we walked down the hallway" as B.P. yelled, "common, I found it," referring to a pouch of cocaine. (*Id.* at 24). Miller testified that the assailant asked him, "if [he] would like to look death in the eye" and tried to put a pillow over his face, but Miller pushed it away. (*Id.*). Miller recalled that the robbery took about 15 minutes and that new sneakers, cell phones, a television, the money in his wallet and about one-half gram of cocaine were taken from his home. Miller went to a neighbor's house and called the police.

Miller did not identify Paschall as the assailant at trial and he noted that Paschall's brown complexion was lighter than the gunman's skin. Miller acknowledged that during his conversations with law enforcement and the District Attorney's Office since this incident, he has not been interested in

testifying or in cooperating with the prosecution, and that he was testifying for the Commonwealth under subpoena.

On cross-examination, Miller testified that Ms. Williams never talked to the police because she was afraid, and he indicated that he understood her fear. Miller advised that there was another individual named "Brad" present in the house that night. Miller stated that that Brad "ain't going to tell you nothing either, because he didn't want no parts of it. And I didn't want no parts of it because I don't know no one." (*Id.* at 34). Miller reiterated that the assailant's complexion was lighter than Paschall's skin tone.

Detective Snell testified that he was tasked with executing a search warrant at B.P's residence and that several items taken in the robbery were recovered in her home. The detective indicated that a woman named Jacquelin Butts, a cousin of Paschall and B.P., drove with them that night but that police were unable to locate her. Detective Snell prepared a forensic report of the contents of B.P.'s phone which showed several text messages and phone calls before, during and after the robbery with Miller and an individual she saved in her phone as "Z.T." B.P. identified Z.T. as Paschall and advised that he had a Facebook profile name of Zamarr Thomas. A search warrant executed on the Zamarr Thomas Facebook account produced about 8,000 documents, and Detective Snell identified Paschall as the man pictured in the profile pictures for this account.

B.P. testified that Miller was her drug dealer for about four years before this incident, that she had purchased heroin from him regularly, and that she has also been charged in connection with this robbery. B.P. recounted that she, Paschall and their cousin Ms. Butts had a conversation in which they decided to rob Miller because "he sells drugs and I know he has money and I know he has drugs." B.P. explained that she saved Paschall's phone number in her phone as "Z.T." because Z.T. was his Facebook name. B.P. testified to the outline of their plan, where she would initially go into Miller's house alone with her cell phone on so Paschall could hear what was going on inside. B.P. could make sure there were no "guns [] in the house to retaliate or whatever. And then I was going to go out once I seen everything was okay and tell Jamar [Paschall] it was clear to come in." (*Id.* at 72-73).

When B.P. reentered the residence with Paschall, she pushed Ms. Williams down, started looking for drugs, and took everyone's cell phones so that they could not make any phone calls. B.P. could hear Miller yelling for help and Paschall saying, "you better open the door." (*Id.* at 75). B.P. recalled that Paschall was wearing jeans, a hoody and a mask covering his face, and that he was armed with a black and silver pistol. Paschall directed her to "tell [Miller] to be quiet or I am going to shoot him," and she complied. (*See id.* at 76). B.P. admitted to being a "willing participant in the robbery," that she injected heroin during the incident, and that she took a TV, cell phones and drugs from the residence. (*Id.* at 76; *see id.* at 84-85, 89).

Paschall took Miller's wallet, drugs and sneakers and they drove to B.P.'s home located a few minutes away. B.P. testified that Ms. Butts did not go into Miller's residence at all and that she acted as their driver.

Regarding the contents of her cell phone, B.P. confirmed that she spoke with Paschall (saved as Z.T. in her phone) and Miller in and around the time of the robbery. B.P. explained that her mindset in facilitating the robbery was to steal drugs because she used cocaine and heroin at that time, and she did not think that Miller would report the robbery to police because he sold drugs.

B.P. conceded that when she initially spoke to police about the robbery, she stated that Paschall was involved, but that she had nothing to do with it. She explained that her intention was to "escape going to jail and go get drugs if I didn't implicate myself in the robbery." (**Id.** at 93-94). B.P. averred that she had not been promised anything in exchange for her testimony and that she had not been threatened or coerced, but that she did hope to receive some consideration for her cooperation with the Commonwealth. B.P. stated her testimony at trial was consistent with what she gave at previous hearings in this case and that she had testified truthfully.

On cross-examination, B.P. acknowledged that she had "told a number of different stories about how this [robbery] was all set up," and that stolen items were found in her apartment. (**Id.** at 105; **see id.** at 108). B.P. conceded that although no promises were made to her in connection with her testimony, she was "hoping to get [her]self out of a jam [and] save [her]self

- 8 -

because [she] got caught." (***Id.*** at 108-09). She reiterated that she did not think that Miller would contact police regarding the robbery because he is a drug dealer.

On redirect examination, B.P. clarified that although stolen goods were found in her apartment, the wallet, drugs and shoes were not recovered there. B.P. also stated that while she had "told some different variations" of the details of the incident, she has consistently "maintained [since her arrest] that the defendant was the male that was with her in the robbery[.]" (***Id.*** at 109).

The jury convicted Paschall of robbery and related offenses and the trial court found him guilty of person not to possess a firearm after a bench trial. The trial court sentenced Paschall to 8½ to 17 years' incarceration followed by two years of probation. Defense counsel filed a post-sentence motion challenging the trial court's denial of his Rule 600 motion, which the trial court denied on February 11, 2022. Counsel then sought to withdraw from representation at Paschall's request because he wished to proceed *pro se* on appeal. The trial court entered orders granting the petition to withdraw and permitting Paschall to proceed *pro se* after a ***Grazier*** hearing.[5] Paschall timely appealed and he and the trial court complied with Rule 1925. ***See*** Pa.R.A.P. 1925(a)-(b).

---

[5] ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998) (requiring trial court to make determination that defendant's waiver of right to counsel is knowing, intelligent and voluntary).

**II.**

**A.**

Paschall first contends that trial counsel was ineffective for failing to interview or subpoena a potential witness, Ms. Butts. Paschall maintains that her testimony would have been helpful to his defense and that counsel's failure in this regard deprived him of a fair trial. (**See** Paschall's Brief, at 3, 6).

"Generally, a claim that trial counsel is ineffective is deferred to collateral review under the Post Conviction Relief Act." **Commonwealth v. Green**, 204 A.3d 469, 486 (Pa. Super. 2019), *aff'd*, 265 A.3d 541 (Pa. 2021) (citation omitted).[6] This rule is subject to narrow exceptions that allow for review of an ineffectiveness claim on direct appeal under circumstances where "(1) the ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; (2) the defendant has shown good cause and knowingly and expressly waives his entitlement to seek subsequent PCRA review from the conviction and sentence; and (3) the defendant is statutorily precluded from obtaining PCRA relief, such as where the court sentenced the defendant to paying a fine only." **Id.** (citation omitted).

None of these exceptions apply to the instant case and, as the trial court and the Commonwealth found, Paschall's ineffectiveness claim is premature

---

[6] **See** 42 Pa.C.S. §§ 9541-9546 (PCRA).

in this direct appeal. We, therefore, dismiss Paschall's ineffective assistance of counsel issue without prejudice for him to raise it on collateral review.

**B.**

Paschall next challenges the weight of the evidence supporting his conviction,[7] which he maintains "solely depended on uncorroborated testimony [of B.P] . . . who suffered from bias/credibility issues," as she told police varying accounts of the incident in hopes of "getting herself out of a jam." (Paschall's Brief, at 3-4, 6). Paschall points to several additional alleged weaknesses in the Commonwealth's case, including Miller's description of the assailant as having a darker complexion than Paschall; its failure to present the testimony of potential witnesses Ms. Williams and the unidentified "Brad;" and the fact that stolen property from Miller's home was recovered from B.P.'s residence. (**See id.** at 3-4, 7).

First, as noted by the trial court and the Commonwealth, Paschall's weight of the evidence argument is waived for his failure to raise it in a motion for a new trial with the trial judge before sentencing or in his post-sentence

_____

[7] Although Paschall refers to his issue concerning B.P. as a sufficiency of the evidence claim, the substance of his argument consists of a challenge to the weight of the evidence, as he fails to identify which element(s) of any of the offenses he is disputing and instead takes issue with the veracity B.P.'s testimony and her "bias/credibility issues." (**See** Paschall's Brief, at 3, 6). Thus, we will treat it as a weight claim. **See Commonwealth v**. **Kinney**, 157 A.3d 968, 972 (Pa. Super. 2017) (explaining claims directed to the credibility of a witness's testimony challenge the weight and not the sufficiency of the evidence and finding weight claim waived for failure to raise it in trial court).

motion. **See** Pa.R.Crim.P. 607(A) (setting forth appropriate procedure for raising weight of evidence claim); (**see also** Trial Ct. Op., at 16, Commonwealth's Brief, at 13).[8]

In any event, Paschall's issue would not merit relief. The jury heard evidence of the alleged shortcomings in the Commonwealth's case and considered it, along with testimony weighing in favor of Paschall's guilt, including B.P.'s comprehensive account of the incident describing the clothes that Paschall wore, the gun that he carried, and the words that he spoke to Miller as he robbed him at gunpoint. B.P. also gave a detailed explanation as to the reasons why they targeted Miller, *i.e.*, because she knew that Miller had money from selling drugs and she did not believe they would be arrested for the robbery because Miller was a drug dealer and she assumed he would not report it. Cell phone and Facebook records showed that B.P. was in close contact with Miller and Paschall before, during and after the robbery. B.P. freely acknowledged that she had given different variations of her own

---

[8] We briefly note that an appellate court reviews a weight of the evidence claim for an abuse of discretion. **See Green**, **supra** at 486. A new trial cannot be granted "because of a mere conflict in the testimony" and is appropriate only where the verdict "is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." **Id.** (citation omitted). We also emphasize that the jury as factfinder, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. **See Commonwealth v. Boyer**, 282 A.3d 1161, 1171 (Pa. Super. 2022).

participation in the crime when she initially talked to police in hopes of avoiding jail time.

Regarding Miller's failure to identify Paschall as the assailant and his testimony that Paschall had a lighter complexion than the gunman, the record reflects that he had a very limited view of the intruder, who wore a mask covering most of his face and a hoody. Additionally, Miller testified under subpoena at trial as a reluctant witness, and he had been unwilling to cooperate with police and the district attorney's office since the investigation began. The record further indicates that potential witnesses Ms. Williams and "Brad" could not be located by police because they were either afraid of retaliation or were otherwise unwilling to cooperate with the prosecution. Finally, although stolen items were found in B.P.'s residence, this is not surprising given that she admitted to her participation in the robbery, and certain key items, including Miller's wallet, shoes and drugs, were not recovered from her home.

The jury as factfinder weighed all of the testimony presented, resolved any inconsistencies in the evidence, and was free to credit the Commonwealth's version of events. Accordingly, even if properly preserved, Paschall's weight claim would not merit relief.

**C.**

Finally, Paschall contends that the trial court erred in denying his pre-trial Rule 600 motion. Paschall maintains that although the Commonwealth

was aware that he was incarcerated for a different offense in Montgomery County, it "did absolutely nothing" to bring him to trial and failed to exercise due diligence. (**See** Paschall's Brief at 8-9).[9]

Rule 600 serves two equally important functions: (1) the protection of a defendant's speedy trial rights; and (2) the protection of society. **See Moore**, **supra** at 248. "However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth." **Id.** (citation omitted). "So long as there has been **no misconduct** on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime." **Id.** (citation omitted; emphasis added). The Rule provides in relevant part as follows:

**Rule 600. Prompt Trial**

(A) Commencement of Trial; Time for Trial

\*    \*    \*

(2) Trial shall commence within the following time periods.

---

[9] In evaluating a Rule 600 issue, we review a trial court's decision for an abuse of discretion. **See Commonwealth v. Moore**, 214 A.3d 244, 247 (Pa. Super. 2019), *appeal denied*, 224 A.3d 360 (Pa. 2020). Our scope of review is limited to the evidence of record at the Rule 600 hearing and the findings of the trial court, viewing the facts in the light most favorable to the Commonwealth as the prevailing party. **See id.** at 248.

(a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

\* \* \*

(C) Computation of Time

(1) For purposes of paragraph (A), **periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence**. **Any other periods of delay shall be excluded from the computation**.

Pa.R.Crim.P. 600 (A)(2)(a), (C)(1) (emphasis added).

Although Rule 600 generally requires that a defendant be brought to trial within 365 days of the filing of the criminal complaint, "a defendant is not automatically entitled to discharge under Rule 600 where trial starts more than 365 days after the filing of the complaint." ***Commonwealth v. Martz***, 232 A.3d 801, 810 (Pa. Super. 2020) (citation omitted). "Rather, Rule 600 provides for dismissal of charges only in cases in which the defendant has not been brought to trial within the term of the adjusted run date, after subtracting all excludable and excusable time." ***Id***. (citation omitted). "The adjusted run date is calculated by adding to the mechanical run date, *i.e.*, the date 365 days from the complaint, both excludable time and excusable delay." ***Id***. (citation omitted). "'Excludable time' is classified as periods of delay caused by the defendant." ***Id***. (citation omitted). "'Excusable delay' occurs where the delay is caused by circumstances beyond the Commonwealth's control and despite its due diligence." ***Id***. (citation omitted). Due diligence

- 15 -

is a fact-specific concept that does not require perfect vigilance and punctilious care, but rather a showing that the Commonwealth has put forth a reasonable effort in bringing the defendant to trial. *See id.* at 810-11.

In this case, the complaint against Paschall was filed on May 28, 2019, making the initial mechanical run date May 28, 2020. As outlined above, at issue in this case is the approximate four-month period from the time of Paschall's arrest and incarceration in Montgomery County up until the scheduling of his preliminary hearing in this case, which he claims is not excusable delay. However, as the Commonwealth argues and the trial court found, this period of time did constitute an excusable delay, as it was beyond the Commonwealth's control and was caused by Paschall's own availability while he in custody in a different county facing new charges. As the trial court explained:

> The sole contention [at the hearing] was that the 118 days between Appellant's arrest and the preliminary hearing should not be excluded. However, the Commonwealth noted that the charges Appellant faced in Montgomery County were not bound over to the Montgomery County Court of Common Pleas until November of 2019, at which time he was made available for transport to Berks County in this matter. The Commonwealth further noted that after attempts with various agencies, they were unable to obtain an explanation as to why Appellant was not available for transport. Moreover, the Commonwealth had placed a detainer on Appellant while he was housed in MCCF. Based on the foregoing, we find that the 118 days between Appellant's arrest and the preliminary hearing were excludable pursuant to Rule 600.

(Trial Ct. Op., at 12).

Based on the foregoing, viewing the facts in the light most favorable to the Commonwealth, **see Moore**, **supra** at 248, we conclude that Paschall's speedy trial rights were not violated and that the trial court properly denied his Rule 600 motion. Although the Commonwealth sought Paschall's transport after his arrest, Montgomery County officials would not allow him to leave their county correctional facility at that time. (**See id.** at 6). The record flatly contradicts Paschall's assertion that the Commonwealth did "absolutely nothing" to seek his appearance in court on these charges and instead reflects no misconduct and a good faith effort to prosecute Paschall. **See Moore**, **supra** at 248. Paschall's final issue lacks merit.

Judgment of sentence affirmed.

President Judge Panella joins the memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/2023

- 17 -